Good morning, Your Honors. May it please the Court, David Lieberman on behalf of the appellants of International Society for Krishna Consciousness, and along with Robert Most, my co-counsel. I would like to reserve three minutes for a rebuttal. All right. Please watch your clock. Thank you. This case has been going on for quite a long time, since 1997. A lot has gone on, or a lot has happened in that period of time. We've been up and down this court, we've been to the California Supreme Court, and back down to the District Court. We've been all over the map. But as we stand here today, the issues are really quite narrow, because it's pretty well established by the Supreme Court in this circuit that form analysis is defined by the access sought by the speaker. We're not talking today about the whole airport, or even those portions of the airport that were formally at issue in this case. Today we're talking about three discrete insular areas. The sidewalks outside are adjacent to the terminal buildings. All the sidewalks? All the sidewalks. The arrivals level lobbies, and certain portions of Tibet, such as the food court and the duty-free shop area, which are quite secure, and are beyond ticketing, and have no impact whatsoever on the interests asserted by the city. We are not talking about any of the areas on the departure level interior terminal buildings. We are not seeking access to anything inside the terminal buildings on the departure level. So just the first floor of the airport? The only interior areas are the arrivals level lobby, where people come out. Not the baggage area, not where they retrieve their baggage, but there's portions of those buildings where people are simply waiting, mostly meters and readers. So we're talking about those areas, and we're talking about certain public areas of Tibet. What is Tibet? Tibet is Tom Bradley International. Okay. Sorry, you started using these acronyms, and it's hard to get them out of your head. Okay, you mean the international? In the international term. Terminal. But primarily we're really talking about the sidewalks, because our position is that the sidewalks are really mandated by ISCON v. Lee. Now, the Port Authority acknowledges that its ordinance, as it is today, formally a regulation, 23.27, was expressly and explicitly patterned after the regulation of Lee. And in Lee, the Supreme Court said it upheld a ban on soliciting, not literature distribution. It allowed literature distribution inside the terminals of the three New York airports. But if banned soliciting, would the express proviso that it be allowed on the sidewalks? No, they didn't say that. They said that what they didn't hold as a matter of law, that in fact that their decision was hinged on whether or not the distribution or the soliciting could occur on the sidewalks. They offered that as a potential mitigation factor. Isn't that right? Reading it, I don't want to pull it out, but I read it a number of times, because I know there's a substantial dispute between you and the appellees on how to read that. Well, I should point out that the city formally in other phases of this litigation, along with the district court, agreed explicitly, and we've cited to those portions of the record where the city and the district court agreed with our reading of Lee, that they tried to uphold different restrictions on speech at LAX by saying explicitly, we're letting them solicit on the sidewalks. But in this case, we're looking at this and looking at the law and deciding what it is. That was a mitigating factor, not a finding. The finding was that the solicitation in the terminals was prohibited. Well, there's two ways of looking at that. The nonpublic forum test is obviously viewpoint neutral, reasonable in light of all of the surrounding circumstances. And there's a third factor that many courts, such as the 11th Circuit in Gilbert and the Fourth Circuit and the Greenberg Spartanburg Airport case, have found that there must be an alternative channel of communication. That's somewhat like the time, place and manner test in a public forum. But what we suggest Lee was doing in its decision, that but for the availability of the exterior sidewalks, which the Supreme Court approved, it did approve those sidewalks in light of the court authority's concerns with pedestrian and traffic congestion, the behavior of solicitors, fraud and duress, airport security. And the Supreme Court did say, however one wants to read the holding of that case, that the sidewalks effectively address those issues. Let me ask you another question. I understand your argument. Let me ask you this. I just want to make sure I understand the facts. Is it stipulated that, with respect to the ordinance, that the portion that requires continuous and repetitive solicitation, that is stipulated, that in fact your clients would, as far as they're concerned, that is something they would do, would be continuous and repetitive? Or is the issue that even if we found, we upheld the ordinance, that they might go there and they may not be in violation because it wouldn't be continuous and repetitive? I'm just asking, is that an issue here? Or is that a fact that wasn't considered, that is stipulated? The issue in this case is continuous and repetitive request for funds. Okay. In other words, you can't, you can go out, you can talk to people, you can give out literature, whatever you're doing, you cannot ask them for a donation. Okay. Or you cannot sell a religious book, which Justice Kennedy, incidentally, would have approved in leave. So your position is, is that your clients would engage and will engage and did engage in continuous and repetitive solicitation. And that's the issue before us. As to whether or not the statute's unconstitutional, on its face, because they do do that. I just want to put that aside. Maybe you can't. If that's not something you can answer here, I want to ask you an issue. What I can answer here is that we don't ask for donations. ISCON members sell books. They sell their religious books. They give somebody a religious book, and in the context of that interaction, which is speech intensive, it's not like, oh, give us a donation. But that's solicitation. That's under the, that's under, is it not? Isn't that undisputed? It could be, or it could be for a fixed price, which is something that Justice Kennedy pointed out in his concurring. But that's not the issue in front of us. The facts are what they are. And we're not talking about hairline distinctions about whether or not there's been a violation by your clients. They're stipulated that we're looking at this statute, or this ordinance, excuse me, on whether or not it's facially unconstitutional. Am I right? Both. Okay. Let me ask you another question. I have looked at the district court opinion, and it was cross motions for summary judgment. So that, in essence, to me, neutralizes the inferences on both sides. So, but the district court judge paid a lot of attention to the expert witnesses and the opinions of those expert witnesses. And as I read it, she found the expert witnesses for your client unreliable. And that was a mistake. Well, mistake is not enough. What is the standard for us to review whether or not her decision on unreliability in contrast to the expert witnesses that were offered by the authority? The city did not offer any expert witnesses. Well, they had, they offered opinions. Opinions of, opinions, literally opinions, and the testimony of two police officers. We provided aviation security experts. And let me tell you, let me explain why the district court was clearly erroneous. The standard is de novo review of everything, because where First Amendment rights are implicated, it's de novo, both factually and legally. Those declarations that were submitted are in the record. She said that they had only been to the airport on a single occasion. Well, it's five, five to, a single occasion, only five to six hours. Yes, yes. And that was mistaken, because if you go through that declaration, you'll find in the next sentence, in the next paragraph, that, for example, with Mr. Elson, he was formerly on the FAA red team. Well, is that in the record we have in front of us? We have cited it in our reply brief to the record where those passages can be found. Both Mr. Elson and Mr. Forbes and Mr. Thomas had been to LAX on numerous, dozens and dozens of occasions, in addition to having reviewed all of the testimony in the case, all of the records and pleadings in the case. So they were thoroughly familiar. Mr. Elson had done FAA undercover operations at LAX when he was with the FAA. Mr. Thomas teaches airport security or aviation security for the International Transport Association. He's an instructor. They have all been to LAX on numerous occasions. In fact, Mr. Forbes was retained by Lazaretta and Associates. If you may recall, there was a big expansion plan for LAX in the context or the history of this case. The county hired Lazaretta and Associates to review the master plan to see how it impacted the county and what the county's position was going to be on that. Mr. Forbes, our expert, was retained by Lazaretta and Associates as their security consultant. So he was completely, all of our experts were intimately familiar with LAX, both on personal inspection. They met with me one time at the airport for five or six hours. I think she said also, and I'm looking at the opinion here, as the court found previously regarding the declarations, and that's what we had is declarations, right? Yes, declarations. Mr. Elson and Mr. Thomas, these declarations do not create a genuine issue of material fact as to whether the restriction reasonably fulfills a legitimate need. So she relied on that, and that basically, it's not the law of the case, but that was cross motions for summary judgment September 18, 2006. Right, but she explained in her summary judgment opinion why she did that, and that was because her view, incorrectly, that they had only been to the airport one time for five or six hours. Secondly, they're the only experts. The city, in this record, at this point of the proceedings, there are no counter experts that the city is relying on. The city is relying on the testimony, essentially, of two LAX police officers, Brummer and Verboa, whose depositions are in the record. And as we have argued and briefed quite extensively, these gentlemen were seriously overzealous in their manner in which they went after the solicitors at the airport, and they did not, and that is a clear, unequivocal fact, have the support of their commanding officers or even their fellow officers within the LAXPD. And as a matter of fact, they were reprimanded, and many of the solicitors who had been brought into custody by these officers were released by their supervisors, and they were admonished, and we have cited those passages in the record. And inordinately, the solicitors that were apprehended or cited were African American, and I have my theories about that, but I won't go into that right now. But one of the officers had a serious issue with African Americans and women on the LAXPD, and that was reflected in the way he conducted his activities at the airport. And he was ultimately put on administrative leave and suspended for a number of reasons. Did you want to reserve some time? I reserved three minutes. Well, you only have a minute and 19 seconds left. Okay. Sorry. Good morning. John Wuerlick on behalf of the City of Los Angeles, and with me here is Tim Dossais, Assistant General Counsel at LAX, City Attorney's Office. I don't know where to begin. There are so many things that continue to pop out of Mr. Lieberman regarding things that are not... He did note that the bans on sale of literature are markedly different than solicitation bans. Isn't that all they're planning to do here, or all they want to do is sell their books? They want to solicit funds, and they want to sell their books. They want to sell their books by walking around just like you would solicit. Their method of operation, so to speak, is to walk around with books, chat with people, proselytize, read this book. Somebody says, oh, thank you, walk away. Oh, give me some money. That's basically, it's a form of either selling or solicitation, however one wants to look at it. That same issue specifically regarding is there a difference between solicitation and sale of books was handled actually in the Eighth Circuit in Iscon versus Miami, which is also cited in the material. The court clearly came out and specifically said it's essentially the same thing. It came out and said that it's also covered, even though the Lee case did not directly address it in the Lee case. That is the sale of books and so forth. Well, this is a... Let me ask you some of the same questions just so that I understand. Is the issue before us have nothing to do whether or not what they were doing was repetitive and continuous so that that's basically clear? Or are we talking about a situation where if we upheld it, we can uphold it on the grounds that they can determine in each instance whether or not the solicitation is repetitive and continuous? The term repetitive and continuous is a term just to say that it's not on one instance, two instances. It's something that has never became an issue. It's never been an issue that has been discussed by Iscon in this case. The most important issue regarding this is that they immediately receive funds, not just receive funds, but immediately receive funds. They're allowed to solicit. But the ordinance says, and it is confusing, that it has to be repetitive and continuous. I don't really know what that means, and that's why I'm asking. But apparently it's not an issue. It's an issue for me. Absolutely. I can see where the issue could come up, but it happens so frequently and so often that it's never become an issue. Okay. So it's not an issue for anybody here. It's not an issue for me. Let me ask you about another case, which is the Fourth Circuit case, which is the Raleigh-Durham Airport Authority case, where are you familiar with that case, where the court in the Fourth Circuit applied a different standard and held that an absolute ban in the terminals for newsstands was unconstitutional. So why isn't the standard there, or what do we have here that's any different? Newsstands. Why, in fact, when you have an absolute ban, which is what you're asking for here, anywhere in the airport, not just in the terminals. And in that case, the court said within the terminal it was unconstitutional. So how do you distinguish that case? Well, first of all, we're talking about newspaper racks that are substantially different than people walking around and addressing people and stopping people in traffic. Stopping people for religious freedom. What's the difference? This case is not about religion. They have stipulated that it has nothing to do with religious freedom. What I'm saying is if your distinction is newspapers and distribution of newspapers, that may well be access to newspapers and the news. I agree with you. But on the other hand, the appellants are saying that the reason why they're doing this has a religious basis. So aren't they, isn't that basically protected, both of them are protected in the same way? If I may say the following in answer to that. The stipulation that they entered into, number 59 in this, in your material, basically says that in drafting, adopting, and implementing section 171.0, this section, and doing all of that, neither the city of Los Angeles, its agents, et cetera, et cetera, its members discriminated against ISCON, against its members, its beliefs, its religious tenets, its expressive conduct, and its viewpoints, or for any other reason, in drafting, adopting, or implementing this section. Well, in the Raleigh-Durham case, the court didn't rely, in that case, on the point that you're trying to make, the distinction you're trying to make here. I'm just suggesting that this case is not about religion. There may be a difference in analysis of something like that in Raleigh-Durham, but there are several different kinds of cases involving newspapers. There are some circuits say, no, you can't have newspapers in the terminals. Others say, I don't think it's been decided, certainly, by all of the circuits, by any means. There isn't another one like Raleigh-Durham that I know of. This was not cited by them, so I haven't focused on that particular case. I apologize. Although I do recall it, there are other cases that come up with precisely the opposite opinion. And he cited, well, for another pencil. I'd be interested to know what those other cases are. Perhaps you can brief them or provide them to us afterwards. I will. Thank you. So let me ask a question for a second. So I just want to understand that this, okay, we're looking at this very specific ordinance, and this ordinance does not ban ISCON members from going to LAX and leafletting or handing out literature to people willing to take the literature and maybe donate later. Precisely, precisely. There is nothing that this ordinance does except say you cannot accept money. You can do anything else that your religion or your free speech or any other aspect that you want, going around the airport, talking to people, talking about your religion, talking about your charitable organization. You can hand them cards. You can hand them self-addressed stamped envelopes. You can hand them anything that you think that would help you get them at some other time to come forward and send money to you. There's nothing stopping that. So just please articulate for me why the immediate solicitation of funds and the transaction is so at odds with the purpose of LAX. To start with, for the same reasons that the United States Supreme Court says that it's at odds, if you look at, for example, several different cases that talk about face-to-face solicitation, this is what this is, face-to-face solicitation. When you see in the paperwork we have here, there's a lot of discussion about different cases talking about how problematic that is. Even the Ninth Circuit in the Acorn case talked about face-to-face solicitation because that was face-to-face. They went off the sidewalks. They went out into the streets. And they said that is not a good way to solicit. They said you should go somewhere else, go down. In fact, our subsequent decision in Harnaleros clarified that Acorn was limited to face-to-face immediate solicitation. It was face-to-face. It was face-to-face in face-to-face solicitation in United States v. Coquinda. It was face-to-face solicitation in the Lee case. It was face-to-face solicitation in Tefron v. ISCON. Those three cases, two of those are all by the U.S. Supreme Court, have said they are concerned with face-to-face solicitation and the results of the activities that occur. There is a difference between walking around handing out paperwork and in asking for money, a substantial difference, because it creates a matter of confusion for people particularly at airports and crowded sidewalks inside terminals or outside. The distinction is as has been stated by the court, by the U.S. Supreme Court, on several cases I've named them. I'm trying to picture the sidewalks at LAX. The only sidewalks are immediately adjacent to the arriving terminals, right? Yes. Also, this ordinance, the sidewalks that, of course, Mr. Lieberman would like to have his members go to are the ones that are adjacent to the terminals. There are also other sidewalks that are affected by this, and that is sidewalks around the parking lots. But he's never really brought that out as an issue in this case. Well, I think it was an issue. As I raised it, it is that there are distinctions determining with respect to where the solicitation would take place. And it was raised, the sidewalks in the parking area were also raised as a question about why the ban has to be so extensive. Well, it's not exactly a ban. It's a limitation. I understand that we're talking about, yes, ban accepting money. Remember that LAX doesn't allow its own people to do it. Tell me when you say it's not a ban. Let me see if I understand. What is prohibited? What is it they are doing that is prohibited, so I understand? And it's supported by the record. Asking for, in conjunction with receiving money, right then and there, right on these properties that we're talking about. And that's what's banned? That's what's banned. Throughout the entire airport? Throughout. Probably in the central terminal area, let's say 90% of it, yes. So there's 10% where they can do this? There are some locations, just coincidentally, because it isn't covered by the ordinance. For example, in front of the administration building, there's a sidewalk. There's not hordes of arriving travelers there, so that's why. Oh, I understand that. I understand. But, I mean, there are some places. I would say probably they're not places that we don't see them over there. If it became a problem, I suppose it might be addressed. You know, I would agree with you that in your papers that LEAD doesn't specifically hold, as I mentioned to the appellant, that as a matter of law that sidewalks, solicitation on the sidewalks is required. But, you know, the language is pretty strong. I recognize this was a much earlier case before 9-11. But the court said the sidewalk area is frequented by an overwhelming percentage of airport users. And that seemed to me to be an important part of their finding is that that as, you know, mitigation. So why is that no longer something that this court should take account of? You're talking about what LEAD said, right? I'm talking about LEAD in the, yes, the majority of people. What LEAD didn't have was 60 declarations of people intimidated by solicitors, 60 different declarations of people that have been the recipients of misrepresentation and fraud, of belligerence, of agitation, of intimidation. Any of those. We have a lot of that. Yeah. It's different. They didn't have that. Okay. So we have, as I mentioned to appellants counsel, we have expert witness testimony that was offered, three individuals, and somewhat dismissively almost ignored by the district court judge. Did you have anybody that would constitute, let's say, a lay witness opinion testimony? Or under Rule 702, did you have anything that constituted special expertise opinion testimony? Several. I don't know where Mr. Lieberman came with saying that we didn't have expert witnesses. The people that got money for us and we paid people for expert testimony, I'm surprised that that never came up. For example, Dr. Myers, he was an expert. Yes, he's the one who has two PhDs, one in, I said, rocket science, one in public accommodations with a specifically addressed two airports. He said, addressed and talked about security issues at the airport. So he's a countervailing force about what they said. But remember, what they said was essentially nothing. I know it sounds crazy. They wouldn't have said anything about the facts at the airport. They go to the airport four or five hours, ten hours, whatever time. They are your experts? I'm talking about their experts. Oh, their experts. Okay. And the reason that's important is because we, you mentioned, oh, their testimony was ignored by the judge. It wasn't ignored by the judge because they're experts and they didn't have expertise. If we call it ignored, it was because they didn't say anything about this ordinance. They didn't have any facts to go to the critical issue that is before the court, and that is whether or not Section 2327C is reasonable, given the purpose of LAX and given the testimony that has been submitted thus far. When they testified for, not testified, when they submitted declarations and submitted reports, they addressed primarily, oh, isn't ISCON people, they're really very good, they're nice, they wouldn't hurt anybody, they have a great plan, they don't intimidate people, et cetera, et cetera. They maybe have six people of the 115 that go to the airport on a daily basis at that time. Six. It's important to take into consideration the global effect of all of the people at that airport. So are you saying they're experts? Yes. As considered by the district court judge, did not address the purposes of the ordinance? Absolutely. Not in any respect? All they addressed, and it seemed like their purpose, it was almost like someone gave them instructions, go investigate and determine and watch our members, how they solicit funds, and tell us, aren't they pretty good? That's exactly what they did. They came out and they said that the ISCON members are very good. They won't create a problem. I guess you could say, gee, if it were only them, six, maybe there wouldn't be such a problem, but there aren't just six. And whatever we give authority to ISCON members to do, we have to give that same authority to all the other 115 or whatever amount of solicitors that might reappear at the airport. All right. If there's no further questions, you're over your time. I'm sorry. Thank you. Thank you. I'm going to try to PowerPoint this. Everything, no matter what one says, the city has never asserted its interests on the sidewalks, on the arrivals level lobby, or the food court and duty-free shop area of Tivitt. All of the previous testimony up until this case, since it came up in the district court, involves those three areas. There's no security issue in these areas. There's no pedestrian traffic congestion in these areas. There's no issue with conduct of solicitors in these areas. The city has presented, if you read their material, interior portions of the departures level of the airport, which is all out the window at this point. A later donation, Mr. Becker's declaration makes it very clear, it was tried, it failed, it does not work. We give out books. These books cost $4 or $5 to print at the publisher. To rely on somebody's goodwill that they're going to send a donation in at a later point when they get home, when they'll most likely forget about it, back, it doesn't work. We experimented with that alternative, and it just didn't work, and that's unrefuted. There's no evidence that the alternatives proposed by the city have any efficacy whatsoever. Lee was very much aware of solicitation problems. I worked on Lee. I worked on many of these airport cases, and these airport authorities, the Port Authority, and did depositions in the World Trade Center when they were there, and they were very much aware, and so was the Supreme Court, both in Lee and HEPRA, the Minnesota State Fair case. In neither case did the Supreme Court go so far as to ban a complete, impose a complete ban everywhere, either on the Minnesota State Fair, they said you have to provide a booth where visitors are encouraged and expected to pass, and in Lee they said we think the sidewalks are a good idea. We agree with the Port Authority that all of these issues, with these bad conduct and fraud and duress and purportedly, and all these other issues, pedestrian traffic and justice, security, these can all be resolved by putting it out on the sidewalk. Lee says that, whether it's a reasonability analysis or whether it's an alternative channel communication issue, the court did say they did provide the alternative sidewalks or exterior sidewalks and said this will solve the problem. We did rely on multimedia. It is cited in our briefs quite extensively. But you didn't rely on Raleigh-Durham that relies on multimedia, right? Maybe you're right. Both news rack cases, though. They were both newspaper cases, and they both came out the same way, and the multimedia cases post Lee and refused to exclude the news racks from the Greenville-Spartan Airport. So the main thing here is that all of the city's evidence, if you examine it carefully, you'll see it all applies to departure levels. That's where all the security is. That's where all the ticketing is. That's where all the check-in is. People are going to catch a flight. In certain parts of the area, time, place, and manner of regulations can be easily imposed. I've presented them to the city on numerous occasions to limit the number of solicitors, limit the problem areas and entrances and exits. These are well established. These are not any problem whatsoever of dealing with these issues. But there is no precedent for a complete ban such as this proposed by the city. The city can't have it both ways. If Lee applies to one portion of the ordinance, it should apply to all portions of the ordinance, and that means that the exterior sidewalks should remain available. Do I have two minutes? No. You're over your other time. Okay. So thank you very much, counsel. We will submit this matter. Okay. You can say one thing. No, you can't, because actually you went over your time, and we have everything in front of us in the briefs and the cases. So thank you.
judges: Silver, Noonan, Wardlaw